IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**KAREN TRESSLER,**  Case No. 3:17 CV 397

    Plaintiff,

    v.  Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.  MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Karen Tressler ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 21). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB in April 2014 alleging a disability onset date of May 19, 2009. (Tr. 196).[1] Her claims were denied initially and upon reconsideration. (Tr. 132, 140). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 147). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on October 13,

---

1. On the date of the hearing, Plaintiff amended her alleged onset date to January 25, 2013. (Tr. 216). Plaintiff had previously filed for DIB in January 2011, and was denied on January 24, 2013. *See* Tr. 82-90

2015. (Tr. 27-55). On November 3, 2015, the ALJ found Plaintiff not disabled in a written decision. (Tr. 11-24). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3); *see* 20 C.F.R. §§ 404.955, 404.981.

Plaintiff timely filed the instant action on February 27, 2017. (Doc. 1). Plaintiff then filed her Brief on the Merits (Doc. 14); the Commissioner filed her Brief on the Merits (Doc. 15); and Plaintiff filed her Reply (Doc. 16). Subsequently, Plaintiff filed a Supporting Memorandum (Doc. 17), which the Commissioner moved to strike (Doc. 18). The undersigned granted to Motion to Strike (Doc. 20).

**FACTUAL BACKGROUND**

Personal Background and Testimony

Plaintiff was born in July 1966, making her 46 years old on her amended alleged onset date. *See* Tr. 196. She alleged disability due to her leg condition. (Tr. 197). She had completed high school. (Tr. 34). Plaintiff was married and lived with her husband and adult children. (Tr. 32-33). Plaintiff had previous work as a housekeeper. (Tr. 35).

Plaintiff testified she had last worked the year before for one month doing housekeeping, but had to stop because her legs would "swell up", "get really red, and "burn". (Tr. 35). Plaintiff stated her leg problems had gotten worse since the prior ALJ's decision. (Tr. 36). The left was worse than the right. (Tr. 36). Her knee and foot would swell, and she got "charley horses in the back of [her] leg." (Tr. 38).

Plaintiff testified she had discussed a left knee replacement, but that her doctor did not want to do it until she was older ("between 50 and 55"). (Tr. 40). She also stated that she did not go through with a recommended partial knee replacement in 2013 because she did not have insurance. (Tr. 43-44). The provider later stated he did not want to do the partial knee replacement

2

because Plaintiff would "have to have it redone in five years anyway" and "if he went in and removed the arthritis it would make it worse." (Tr. 44). Plaintiff had tried physical therapy, which "didn't help either". (Tr. 37). She also took Mobic and Tramadol, which she testified did not help. *Id.* Plaintiff stated she had improvement with Mobic, but it only lasted a month. (Tr. 39). She was, however, still taking it. *Id.*

Plaintiff testified she needs to elevate her legs during the day. (Tr. 40). In a normal day, Plaintiff spends "most of the day" with her legs elevated waist-high. (Tr. 45). After any activity, Plaintiff needs to elevate her legs. *Id.* She sits in her recliner, and wraps her knees in an electric blanket to obtain pain relief. (Tr. 40).

Plaintiff testified she did not have any problems taking care of herself, and performed household chores like vacuuming, cooking, and laundry ("as long as I can sit and fold it"). (Tr. 41). She later testified she sometimes had to sit down when showering, and had to take breaks while cooking. (Tr. 45). She stated she could not do dishes because she could not "stand there very long to do them." (Tr. 41). She played games on her computer, but "[n]ot very often because [her] legs can't hang down". (Tr. 42). She had a driver's license and drove approximately once per week. (Tr. 33-34).

Plaintiff estimated she could walk around the block, before her left knee "kind of catches". (Tr. 41). She could stand for "[m]aybe five minutes" and sit "most of the day as long as [her] legs aren't hanging down". *Id.* She could push and pull with her arms, but not her legs. (Tr. 41-42). She could reach in all directions with her arms, and handle and finger. (Tr. 42). She could lift about 50 pounds, but could not bend, squat or crawl. *Id.* She could climb stairs "but it hurts so [she] take[s] [her] time". *Id.*

3

Relevant Medical Evidence[2]

In December 2012, before her alleged onset date, Plaintiff saw Michael Koenig, PA-C for "followup of left knee pain and discomfort" that was "affecting her activities of daily living". (Tr. 674). Mr. Koenig noted Plaintiff had previously had cortisone injections without improvement, and that she was having trouble "getting up and down from a seated position." *Id.* He opined she was "[u]nable to be gainful[ly employed secondary to the pain that she [was] experiencing." *Id.* On examination, Plaintiff had crepitus with flexion and extension, an antalgic gait, and tenderness to the medial joint line. *Id.* He assessed "[l]eft knee medial end stage osteoarthritis", and discussed future surgical intervention. *Id.*

Plaintiff underwent an MRI of her left knee in March 2013. (Tr. 326). It showed small joint effusion; tricompartmental osteoarthritis; thinning and degeneration of both menisci with a small radial tear of the posterior horn of the lateral meniscus suspected; a very small anterior horn medial meniscus; and mild prepatellar soft tissue edema. *Id.* Plaintiff had a follow-up appointment with Mr. Koenig a few days later. (Tr. 392). He noted the MRI results, and that Plaintiff had a previous arthroscopic surgery on her left knee in 2008 without much improvement. *Id.* Plaintiff reported a pain level of 8/10 "with trouble doing activities of daily living and [this] subsequently affects her quality of life." *Id.* On examination, Mr. Koenig noted "[v]arus deformity seen with ambulation", an antalgic gait, a tight ACL, and "severe pain with palpation in the medial compartment." *Id.* Mr. Koenig noted "due to the severity of her arthritis and the symptoms that she is experiencing" Plaintiff was "unable to walk for an extended period of time, nee[ded] to consistently elevate her

---

2. Plaintiff challenges only the ALJ's consideration of her knee and leg problems. *See* Doc. 14. Issues not raised in a claimant's opening brief are waived. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003). As such, the undersigned summarizes only the relevant records.

leg throughout the day for pain control, [and was] unable to kneel, crawl, twist, turn stoop[], squat[] with her knee." *Id.* Additionally, he noted "stairs and ladders are very difficult for her." *Id.* He also indicated "with the nature of her knee, she is unable to be gainfully employed at a function, which is more than seated work only." *Id.* Mr. Koenig discussed with Plaintiff a "unicompartment medial hemiarthroplasty for pain control" and noted Plaintiff would "contemplate our discussion." *Id.*

In April 2014, Plaintiff went to the emergency room reporting swelling, pain and redness in both legs. (Tr. 421, 430). Examination showed some redness and petechia on both legs. (Tr. 421, 447). She reported it started two weeks prior when she started a new job, increased the longer she was standing, and decreased with rest and elevation of her legs. (Tr. 421, 430). Plaintiff was prescribed medication and discharged. (Tr. 428, 431, 450).

Plaintiff had a follow-up appointment two days later with Misty Slater, M.D. (Tr. 605-07). She reported leg pain and swelling, with an itchy red rash extending up to her knees. (Tr. 605). Plaintiff reported "that as she stands for more days consecutively for work the rash and pain ascend up toward her knees." *Id.* Dr. Slater noted Plaintiff was "awaiting a left knee replacement, which she is getting at age 50." *Id.* She assessed venous insufficiency and referred Plaintiff to vascular and cardiology. (Tr. 606).

In June 2014, Plaintiff saw Andrew Seiwert at VeinSolutions. (Tr. 742-46). Plaintiff reported pain, swelling, and redness in both legs, affecting her ability to work. (Tr. 742-43). Plaintiff reported she treated this with elevation, compression hose, pain medication, and exercise. *Id.* An examination showed no sign of thrombosis. (Tr. 743, 745-46). Plaintiff was noted to have reflux in her great saphenous vein. (Tr. 745-46).

In July 2014, Plaintiff saw April L. Rock, NP. (Tr. 752-53). Plaintiff reported leg pain affecting her sleep, and swelling during the day. (Tr. 752). Plaintiff reported "burning" and

5

"cramping" pain in both legs that was "severe (when they are swelling and with any standing an[d] any walking)." *Id.* On examination, Ms. Rock noted a "[v]ery small amount of non-pitting edema BLE feet to knees." (Tr. 753). She assessed venous insufficiency, and prescribed knee-high compression stockings (to be worn all waking hours), and recommended Ibuprofen or Tylenol. *Id.* She also noted Plaintiff should elevate her legs "as much as possible" and should follow up with vascular and Dr. Slater "as scheduled." *Id.*

Plaintiff returned to Dr. Seiwert at VeinSolutions in September 2014. (Tr. 779). Dr. Seiwert noted Plaintiff's venous duplex scan showed reflux in the left greater saphenous vein, "but only in the peri-genicuate region" and that this vein "connects to a large . . . cluster of varicosities which encircle the knee." *Id.* He also noted "[t]he deep systems function normally bilaterally." *Id.* Dr. Seiwert prescribed thigh-high compression stockings, and noted that if her symptoms persisted, he would "likely recommend catheter-directed ablation of the left greater saphenous vein". *Id.*

Plaintiff saw Jennifer Weber, M.D. in October 2014 for a physical and medication check (related to hypertension). (Tr. 795-96). Dr. Weber noted Plaintiff had a history of venous insufficiency, and "since being switched off Norvasc lower edema has resolved." (Tr. 795). Plaintiff reported she "only uses compression stockings because the vascular surgeon[] . . . [said] she has a leaky vein in her leg that needs it." *Id.* On examination, Dr. Weber specifically noted "[n]o lower extremity edema bilaterally." (Tr. 796).

In June 2015, Plaintiff presented to Mr. Koenig with "[l]eft knee pain since 2008" that she reported was 10/10, burning and sharp, and intermittent. (Tr. 814). The pain would wake her at night and she treated it with ibuprofen and heat. (Tr. 814-15). Mr. Koenig noted Plaintiff had previously tried ibuprofen, Kenalog injections, Visco supplementation injections, and physical therapy without success. *Id.* Plaintiff also had a brace, "that she wears occasionally", but reported

6

"use of the brace makes her pain worse." *Id.* On examination, Mr. Koenig noted Plaintiff's left knee had "mild varus alignment", "[m]inimal [k]nee effusion", an antalgic gait, crepitus with flexion and extension, and range of motion was "0-125 degrees in extension and flexion". (Tr. 816). Plaintiff had "trouble sitting down and getting up from the chair". *Id.* Mr. Koenig noted left knee x-rays "show[ed] no fracture or dislocation", soft tissues [were] unremarkable", [m]oderate medial knee joint space narrowing", "[m]inimal periarticular spurs . . . along the medial from condyle, medial tibia plateau, and . . . minimal spur along the upper pole of patella." *Id.* Mr. Koenig assessed left knee pain and primary osteoarthritis of the left knee. *Id.* Mr. Koenig noted Plaintiff had "been doing [an] aggressive conservative treatment course" and might benefit "from repeat course of physical therapy for her left knee arthritis." *Id.* He prescribed anti-inflammatory medication. *Id.*

Plaintiff returned to Mr. Koenig in July 2015. (Tr. 808-10). She reported left knee pain, which had "improved with PT and Mobic." (Tr. 808). Her pain level was 2/10 at rest, and 7/10 "depending on activity." *Id.* The pain was aggravated by movement and alleviated at rest. (Tr. 809). Plaintiff had returned to physical therapy, and switched her previous anti-inflammatory medication to Mobic, and was wearing an over-the-counter knee brace. *Id.* She "[c]urrently note[d] a 50% improvement in her current symptoms from last visit." *Id.* On examination, Mr. Koenig noted mild varus alignment, an antalgic gait, knee effusion, tenderness to palpation to the medial joint line, crepitus on flexion and extension, and a range of motion of 0-120 degrees on extension and flexion. *Id.* Mr. Koenig noted that "[a]t this time she has improved" and continued Plaintiff's medication "along with a home exercise program from quad strengthening with hamstring stretches." *Id.* He again noted "[u]ltimately as her arthritic changes in her knee changes progress[,] a total knee arthroplasty may be of appropriate value in her future". *Id.*

7

*Opinion Evidence*

At Plaintiff's March 2013 office visit, physician assistant Mr. Koenig opined:

At this time, due to the severity of her arthritis and the symptoms that she is experiencing: she is unable to walk for an extended period of time, needs to consistently elevate her leg throughout the day for pain control, unable to kneel, crawl, twist, turn, stoop[], squat[] with her knee, stairs and ladders are very difficult for her[.] . . . At this time, with the nature of her knee, she is unable to be gainfully employed at a function, which is any more than seated work only.

(Tr. 392).

In June 2014, state agency physician William Bolz, M.D. reviewed Plaintiff's records on behalf of the state agency. (Tr. 107-09). Dr. Bolz opined Plaintiff was limited to light work, and could stand or walk for four hours in a workday, and sit for six hours. (Tr. 107). He opined Plaintiff was limited in her left leg, and could operate left foot controls only "occasionally within tolerance." (Tr. 107). He noted these restrictions were due to venous insufficiency. *Id.* He thought Plaintiff could occasionally climb ramps or stairs, balance, stoop, or crouch; but could never crawl, kneel, or climb ladders, ramps or scaffolds. (Tr. 107-08). He noted these restrictions were due to pain and limited range of motion in her left knee. (Tr. 108). He also noted that due to her antalgic gait, Plaintiff should avoid all exposure to hazards such as "commercial driving, dangerous, machinery, and unprotected heights due to risk of fall or injury." *Id.*

In July 2014, nurse practitioner Ms. Rock advised Plaintiff to elevate her legs "as much as possible" due to venous insufficiency and swelling. (Tr. 753).

In October 2014, state agency physician Elaine Lewis, M.D., reviewed Plaintiff's records and affirmed Dr. Bolz's conclusions. (Tr. 121-23).

At Plaintiff's June 2015 appointment, Mr. Koenig opined:

Due to her subjective complaints of pain I think it would be difficult for her to ambulate long periods of time where [s]he stand[s] for long periods of time which would make certain types of employment difficult that are physically demanding.[]

8

> A physical functional capacity evaluation may be appropriate for work restrictions in the future if symptoms persist.

(Tr. 816-17).

VE Testimony

A VE appeared and testified at the hearing before the ALJ. (Tr. 48-53). The VE testified that given the prior ALJ's RFC, the same jobs he identified in the prior hearing, in the same numbers, still existed. (Tr. 49-50). The VE also provided testimony in response to other hypothetical questions that differed from the ALJ's ultimate RFC determination. (Tr. 50-53). He testified that if an individual had to elevate her legs waist high, it would preclude both Plaintiff's prior work and any other jobs. (Tr. 52).

ALJ Decision

In his written decision, the ALJ first found Plaintiff last met the insured status requirements of the Social Security Act on September 30, 2014, and had not engaged in substantial gainful activity from her amended alleged onset date of January 25, 2013, through her date last insured. (Tr. 14). He concluded Plaintiff had severe impairments of osteoarthritis/degenerative joint disease of the bilateral knees and obesity, but that these impairments did not meet or medically equal one of the listed impairments. (Tr. 14-15). The ALJ then concluded Plaintiff:

> had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: she could never climb ladders, ropes, or scaffolds; she could frequently climb ramps and stairs; and she could occasionally kneel, crouch, and crawl.

(Tr. 15). In so finding, the ALJ explained that he was bound by a prior ALJ's January 2013 decision because Plaintiff had not shown a material change in his condition. (Tr. 18). The ALJ then found Plaintiff was capable of performing past relevant work as a housekeeper (Tr. 18), and was therefore not disabled through her date last insured (Tr. 19).

9

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises a single assignment of error for review:

The ALJ failed to adequately consider the opinions and evidence of medical experts that Plaintiff's legs must be constantly elevated, and in failing to do this, failed to properly evaluate Plaintiff's Residual Functional Capacity (RFC) at step three of the sequential evaluation.

(Doc. 14, at 2, 10).[3] That is, Plaintiff only challenges the ALJ's decision not to include leg elevation in the RFC determination.[4] Within this argument, Plaintiff challenges the ALJ's treatment of Mr. Koenig and Ms. Rock's opinions about elevating Plaintiff's legs. The Commissioner responds that the ALJ's decision is supported by substantial evidence and should be affirmed. Specifically, the Commissioner contends the ALJ properly determined Plaintiff had failed to present new and material evidence, and thus, the prior RFC determination was binding. For the reasons discussed below, the undersigned finds the ALJ's decision supported by substantial evidence and therefore affirms that decision.

Drummond Ruling

Although Plaintiff does not frame her argument in the context of the *Drummond* ruling, it is relevant here as the ALJ found he was bound by a previous ALJ's RFC determination. *See* Tr. 18 ("The undersigned is bound by the previous residual functional capacity because new evidence does not show a material change in the claimant's condition or changed circumstances."). Prior decisions of the Commissioner which are not appealed are binding on a claimant and the Commissioner. *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 841 (6th Cir. 1997). In *Drummond*, the Sixth Circuit held that the Commissioner is bound by its prior findings with regard to a claimant's RFC unless new evidence or changed circumstances require a different finding. *Id.* at 842. Social Security Ruling 98–4(6) therefore mandates:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt

---

3. As the undersigned noted in a previous order, in her conclusion, Plaintiff requests remand *both* pursuant to sentence four *and* sentence six of 42 U.S.C. § 405(g). *See* Doc. 20, at 2 (citing Doc. 14, at 13). However, as previously noted, Plaintiff points to no "new" evidence in support of a sentence six remand. *Id.* As such, the undersigned only considers Plaintiff's arguments for a sentence four remand.
4. By extension, therefore, Plaintiff contends she is disabled, because the VE testified that a need to elevate the legs waist high would preclude all jobs. *See* Tr. 52.

such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

SSR 98–4(6), 1998 WL 283902, at *3.

It is the Plaintiff's burden to show that circumstances have changed since the prior ALJ's decision "by presenting new and material evidence of deterioration." *Jones v. Comm'r of Soc. Sec.*, 2015 WL 4394423, at *5 (N.D. Ohio) (quoting *Drogowski v. Comm'r of Soc. Sec.*, 2011 WL 4502988, at *8 (E.D. Mich.), *report and recommendation adopted*, 2011 WL 4502955). Such evidence is new only if it was "not in existence or available to the claimant at the time of the [prior] administrative proceeding." *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990). Such evidence is "material" only if there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988). Plaintiff argues about the ALJ's failure to include leg elevation in the RFC, seemingly arguing this is new and material evidence of a change in her condition.

Residual Functional Capacity

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence *Id.* § 404.1529. An ALJ considers numerous factors in constructing a claimant's RFC, including the medical evidence, non-medical evidence, and the claimant's credibility. *See* SSR 96-5p, 1996 WL 374183, at *3; SSR 96–8p, 1996 WL 374184, at *5; *Hickey-Haynes v. Barnhart,* 116 F. App'x 718, 726-27 (6th Cir. 2004). While an ALJ must consider and weigh medical opinions, the RFC determination is expressly

13

reserved to the Commissioner. *Ford v. Comm'r of Soc. Sec.*, 114 F. App'x 194, 198 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(e)(2), 404.1546. And, it is worth reiterating that the Court must affirm "so long as substantial evidence also supports the conclusion reached by the ALJ" even if substantial evidence or indeed a preponderance of the evidence *also* supports a claimant's position. *Jones*, 336 F.3d at 477.

Preliminarily, Plaintiff appears to argue the ALJ violated the treating physician rule by not mentioning Mr. Koenig's opinion regarding Plaintiff need to elevate her legs. *See* Doc. 14, at 12 ("the ALJ did not mention, nor gave substantial deference to the medical opinion of Plaintiff's treating physician in regards to the medical orders to elevate her legs throughout the day").

Under the regulations, a treating physician's opinion is entitled to controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (6th Cir.2007). The ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id.* This rule, however, applies only to treating physicians. Only "acceptable medical sources" can be considered a treating source whose medical opinion could be entitled to controlling weight under the treating physician rule. SSR 06-03p, 2006 WL 2329939, at *1; *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 550 (6th Cir. 2014). A physician's assistant is not an "acceptable medical source" under the regulations. *See* 20 C.F.R. §§ 404.1513(a), (d). Therefore, an opinion from a physician's assistant is not entitled to the same deference due a treating physician's opinion. *See, e.g., Morales v. Comm'r of Soc. Sec.*, 2013 WL 4780263, at *3 (W.D. Mich) ("There is no 'treating physician's assistant rule' and the opinion of a physician's assistant is not entitled to any particular weight."). An opinion of a physician's assistant falls within the category of information provided by "other sources". SSR 06-03p, 2006 WL 2329939, at *2.

The regulations recognize that information from other sources—such as physician's assistants—"may be based on special knowledge of the individual and may provide insight into the severity of the impairment[] and how it affects the ability to function." *Id.* Therefore, opinions from these sources "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* at *3. The same factors applied to acceptable medical sources apply to opinions form these other sources. *Id.* at *4 (citing 20 C.F.R. § 404.1527(d)) (listing factors of length and extent of treatment relationship, consistency, supportability, how well explained an opinion is, area of specialty, and "[a]ny other factors that tend to support or refute the opinion."). *Id.* at *4-5. "[T]he Commissioner has broad discretion in weighing such an opinion" from a non-acceptable medical source. *Brown v. Comm'r of Soc. Sec.*, 591 F. App'x 449, 451 (6th Cir. 2015).

Notwithstanding Plaintiff's arguments to the contrary, the ALJ's evaluation of Mr. Koenig's opinion here complied with the regulations and is supported by substantial evidence. The ALJ specifically acknowledged Mr. Koenig's March 2013 opinion, and stated the opinion was given "little weight" because:

> His conclusions appear to be in excess of the findings on the diagnostic testing. The MRI of the left knee showed only moderate tricompartmental osteoarthritis [citing Tr. 326]. Although the claimant had an antalgic gait, she was still able to ambulate despite not taking any pain medications. Further, the claimant had very few complaints of knee pain for almost a year following this assessment.

(Tr. 16). Later in the decision—at the end of his analysis of the opinion evidence and Plaintiff's testimony—the ALJ stated:

> The continued conservative approach to treatment supports the conclusion that there has not been significant worsening. The record also fails to support the claimant's allegation of a need to elevate her feet throughout the day.

(Tr. 17).

15

An ALJ is not required to discuss every piece of evidence in the record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2010). And the ALJ's reasons here for assigning little weight to Mr. Koenig's opinion are supported by the record. First, the ALJ discussed the objective findings in the record, noting that a contemporaneous MRI showed "only moderate tricompartmental osteoarthritis". (Tr. 16) (citing Tr. 326). Consideration of consistency of an opinion with the remainder of the evidence of record is an appropriate consideration. *See* SSR 06-03p, 2006 WL 2329939, at *4 (citing 20 C.F.R. § 404.1527(d)).

Second, the ALJ noted that although Plaintiff had an antalgic gait, "she was still able to ambulate despite not taking any pain medications". (Tr. 16). Again, this reason goes to the consistency of the opinion with the remainder of the evidence, as well as the supportability of the opinion, both appropriate considerations. *See id.*

Third, the ALJ noted Plaintiff "had very few complaints of knee pain for almost a year following this assessment." (Tr. 16). This, again is supported by the record. *See* Tr. 392 (March 2013 visit to Mr. Koenig) *and* Tr. 421 (next evidence of record from April 2014 emergency room visit). Failure to seek treatment, and overall conservative treatment are valid reasons for discounting Mr. Koenig's opinion that Plaintiff was more limited than the ALJ found. *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 631 (6th Cir. 2016) ("The ALJ noted that the records indicate Kepke received only conservative treatment for her ailments, a fact which constitutes a 'good reason' for discounting a treating source opinion"); *Lester v. Comm'r of Soc. Sec.*, 596 F. App'x 387, 389 (6th Cir. 2015) (finding ALJ reasonably discounted a doctor's proposed limitations because, among other things, the claimant was receiving conservative treatment); *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 806 (6th Cir. 2011) ("the ALJ reasonably viewed Francis's limited treatment as inconsistent with Dr. Wakham's opinion"). Moreover, the

undersigned notes that Mr. Koenig's later records do not mention leg elevation and consist of continued conservative treatment with anti-inflammatories and physical therapy. *See* Tr. 808-10, 814-16; *see also* Tr. 17 ("The continued conservative approach to treatment supports the conclusion that there has not been significant worsening."). The undersigned therefore finds no error in the ALJ's decision to discount Mr. Koenig's opinion. This is so even though the ALJ did not specifically mention Mr. Koenig's opinion about leg elevation because the ALJ gave reasons supported by the record to discount Mr. Koenig's opinion overall, and later explicitly declined to impose a leg elevation requirement, relying in part on an analysis of Plaintiff's credibility.[5] *See* Tr. 17 ("The continued conservative approach to treatment supports the conclusion that there has not been significant worsening. The record also fails to support the claimant's allegation of a need to elevate her feet throughout the day.").

The undersigned finds no error even though Plaintiff points to additional evidence in the record in support of her conclusion, namely advice from nurse practitioner April Rock in July 2014 that Plaintiff should elevate her legs. *See* Tr. 752-3. The ALJ noted Ms. Rock's assessment of venous insufficiency, and recommendation over-the-counter medication (ibuprofen or Tylenol), noting again that "[t]he conservative treatment approach suggests that her condition was not as limiting as alleged." (Tr. 17). Ms. Rock is, similar to Mr. Koenig, not an acceptable medical source, nor a treating physician entitled to deference under the regulations. *See* 20 C.F.R. §§ 404.1513(a), (d); SSR 06-03p, 2006 WL 2329939, at *1; *Morales*, 2013 WL 4780263, at *3.

And, a claimant's conservative treatment may provide a reason to undermine claims of disability or to discount opinion evidence. *Kepke*, 636 F. App'x at 631; *Lester*, 596 F. App'x at

---

5. Plaintiff does not challenge the ALJ's assessment of her credibility, and has thus waived the issue. *See Kennedy*, 87 F. App'x at 466.

389; *Francis*, 414 F. App'x at 806. Again, the Court must affirm "so long as substantial evidence also supports the conclusion reached by the ALJ" even if substantial evidence or indeed a preponderance of the evidence *also* supports a claimant's position. *Jones*, 336 F.3d at 477.

Finally, Plaintiff contends in reply that "the VE expert testimony during Plaintiff's . . . hearing supports the argument that the Plaintiff's RFC requires her to keep her legs elevated" because "the VE opined that an individual that was instructed to elevate their legs throughout the work day at waist high . . . would have all possible employment eliminated." (Doc. 16, at 5) (citing Tr. 52). Plaintiff then states that "[t]his was the RFC applied by the VE, and thus, should have then [sic] RFC applied by the ALJ in his decision." *Id.* This argument misunderstands the role of the VE at an ALJ hearing. The ALJ, not the VE, determines Plaintiff's RFC. Although Plaintiff is correct regarding the VE's testimony regarding leg elevation being work-preclusive, the ALJ ultimately did not adopt that restriction in Plaintiff's RFC, and therefore (if the RFC is supported) the VE's testimony on that point is not relevant. The VE testified that if an individual were limited in the way in which the ALJ ultimately found, she would be capable of past work as well as other jobs in significant numbers in the national economy. (Tr. 50). The ALJ is only required to adopt in the RFC those restrictions he finds credible and supported by the record, *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993), and—if the RFC comports with a hypothetical question to the VE—the VE's testimony provides substantial evidence for the ALJ's Step Five finding, *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). Thus, because the undersigned finds the ALJ's RFC determination supported by substantial evidence—as discussed above—the ALJ did not err in relying on the VE testimony.

## Conclusion

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB supported by substantial evidence and affirms that decision.

    s/James R. Knepp II
United States Magistrate Judge